Attorney Chancellor of Friday 5, Toral America v. Illinois Pollution Control Board, Anthony Vickers, for adjournment. May it proceed. Thank you, Your Honor. May it please the Court, my name is John Simon and I represent TORAL. This case is a success story. This case is a success story for TORAL because they achieved compliance with the Act and a more efficient and economical operation of their business. It's a success for the agency because the agency was able to bring this manufacturer into compliance. It's a success for the local economy because TORAL was able to remain operating in Blackport and continue business in supporting the economy. It's a success for the employees because they kept their jobs and of course it's a success for the environment because the VOM emissions were controlled. This example of the cooperation between the regulated and the regulators with the assistance of the consultants is exactly the model that the legislature envisioned for meeting and overcoming the technical challenges of increased environmental regulation. We're not choosing between having economic activity and having environmental protection but we're accomplishing both in a cooperative manner. The principal reason for authorizing the imposition of civil penalties was to provide a method to aid in the enforcement of the Act. Punitive considerations were secondary. This is exemplified, this legislative intent is exemplified by the provision of the Section 33C factors which are to be considered not just in terms of determining the violation of the Act but are to be considered based on the evidence in the record and as to whether a penalty should be imposed and if so the amount of the penalty. This case is not about whether TORAL was out of compliance with the VOM emissions. TORAL self-reported its lack of compliance with its Clean Air Act permit application in 1996. TORAL repeatedly reported to the IEPA exactly what emission units were controlled and which weren't and how they were being controlled and there was never a time when the IEPA didn't know exactly what was going on in this facility throughout the period of non-compliance. What this case is about is about how TORAL without any precedent for a capture and control of 81% of VOM emissions for the aluminum flake and aluminum powder that it manufactured at its plant that it achieved that which had never been done in this country or in the world for that matter. The evidence in the record was that no other plant in this country that manufactured the aluminum powder and aluminum flakes had this type of capture and control for their VOM emissions and nor in the world. This was achieved despite the fact that aluminum powder and aluminum flakes are highly explosive and highly flammable and require very special environment to operate under which can create more challenges for the VOM control. And also the legislature provided that when the board issues its final orders it's in section 41B of the act that the board's final order shall be based solely on the evidence in the record of the particular proceeding. It's significant therefore that there is no record evidence of any environmental injury of any character or degree from TOIL's non-compliance nor is there record evidence of any interference with the information gathering and oversight roles of the agency. The decision of the board to weigh this 33C factor in favor of imposing a substantial fine is not based on record evidence. Rather it's based entirely on the fact of the violation itself. Proper consideration of the 33C factor in the record would not support the imposition of the penalty on TOIL nor is there any record evidence diminishing the social and economic value of TOIL and the 89 jobs that it provides in the community. Nevertheless the board refused to consider this factor in TOIL's favor simply because of the violation, existence of the violation. Likewise there's no evidence in the record diminishing the suitability or challenging the suitability of TOIL for its particular location, the third 33C factor. Nevertheless the board refused to consider this in TOIL's favor merely because of the fact of the violation. As to the technical practicability factor, our Supreme Court has held that the statute places the burden on the agency to come forward with evidence that emission reduction is practical. I'm referring to the Wells Manufacturing Case 73, Illinois 2nd, 226 at 236. The agency provided no evidence of any technically practical and economically reasonable alternative that would have brought about compliance for TOIL more quickly than the path actually followed by TOIL. The board's decision to weigh this 33C factor against TOIL is based solely on the fact that TOIL did not seek a variance up front from this requirement. In other words, TOIL didn't go to the board and say don't force me to comply with this capture and control requirement because it's technically impractical for me. Well, instead TOIL focused its attention on achieving, designing, engineering, manufacturing, and actually then constructing and implementing capture and control technology which did achieve this. Nevertheless, the board's refusal to consider the technological impracticability of timely compliance based on the failure of TOIL to seek an up front variance was referred to by the second district appellate court as a irrelevant procedural consideration. I'm referring to the case of Modine Manufacturing, 193, 3rd, 643 at 650. And indeed it is an irrelevant procedural consideration. The legislature asked the board to consider the technical practicability, not whether they proceeded in the desired manner of first seeking the variance. And if they didn't, then there would be no consideration given to the technical practicability in the penalty phase. So how would they know about the technical impracticability if they didn't tell them? Well, we did tell them in the record in this case. And actually the agency knew because the agency was in our plans as well. So the board knew it because the board reviewed the record in this case before they imposed the substantial penalty. But they refused to consider that evidence. But at the time that they imposed the penalty, you had complied, right? Over seven years before. In fact, we complied in 2003. The penalty in this case was imposed in 2010. Over seven years. And that's the last element of the 33C factors is the subsequent compliance. And the board acknowledged that we had complied in 2003 and that there was no issue of noncompliant subsequent to that. But you were noncompliant for eight years? 1995 to 2003. On this record- Let me ask you a question. If you had requested a variance, would you have been able to continue operations? Well, we would have requested to continue operations. That would be a decision, of course, for the board. But presumably, we would have been able to continue operations if we could demonstrate the technical impracticability. But that's a question for the board. We didn't pursue that route. Because you may not have been allowed to continue operations. This way, operations continued and there was this cooperative effort. That's correct. And we believe that that's what the legislature intended. And compliance with the environmental regulations is the goal. But immediate compliance is not paramount in the sense that it shouldn't be a choice between economic activity, you know, continuing the plant, and the environment. We believe that the legislature intended both. And we think this is an exact example of what the legislature was trying to achieve here, what TOIL did. I have another question for you. And this is just because maybe I don't understand the regulations. I know I'm chewing up your time. No, no. You got your first notice of violation in 1998, July 15th of 1998. Why did the penalties go back to the date the new act went into effect, 1995? You know, the understanding is that it was our job to become familiar with the regulations and to comply with them in a timely manner. It's not just that we have to do it upon receiving notice from the agency. And in fact, in 1996, we were trying to do it with our submission of the cap regulation, but we self-disclosed that we weren't in compliance. Do the rights allow them to impose a penalty all the way back to the effective date of the new regulations? We're not challenging the ability to go back to that date. All right. You know, if there's something I don't know about, I'm sorry. No. The board's economic benefit determination is methodologically flawed. The board adopted Gary Steisen's deferred, I'm sorry, deterrent approach to the calculation of economic benefit. Gary Steisen's acknowledged that he departed from the well-established U.S. EPA and published and well-circulated, well-known U.S. EPA method for calculating economic benefit. Because he believed that any consideration that would reduce the amount of his economic benefit calculation would undermine what in his mind was the deterrent effect of an economic benefit. He didn't disagree with the fact that there was a cost savings from the solvent recovery system and that the solvent recovery system could only be implemented with a compliant system and could not have been achieved without the compliant system. He just refused to follow the U.S. EPA method because it would have eliminated the economic benefit. Was his departure because the method that you're talking about was for settlements and not for litigation? Well, he says that. That's his testimony. But, in fact, that's not the case. The same method for ascertaining penalties is used in settlement and litigation. The U.S. EPA points out, though, in litigation you need to present an expert, financial expert witness who can explain and defend the calculation and lay a foundation for it. That doesn't mean that you don't use the same method. So, Mr. Steisen's is incorrect and there's nothing in the U.S. EPA policy that says this method can't be used. They say that you can't simply introduce the product of the computer model into evidence. You need to have a foundation for it. That's the only point. How does that make any sense, the method that your expert was espousing? Because what you're trying to do with the economic benefit is you're trying to ascertain whether this company actually benefited by virtue of the noncompliance. And then, in other words, so that then you level the playing field against any competitors. There are no competitors that were subject to this regulation, so leveling the playing field doesn't apply in this case. But you want to encourage a person not to make an economic decision for noncompliance over compliance because noncompliance is going to be cheaper. And then you wipe out that rationale by then coming back and saying, but if you had lost profits because of your noncompliance, that can somehow be offset against the economic benefit. That just wipes out any penalty at all. Well, no, because the economic benefit is an objective measurement of whether you had an economic benefit from the noncompliance. In this case, Mr. McClure demonstrated that there was no economic benefit from noncompliance. We actually operate more economically efficiently compliant. What you then also have are what are called the gravity components, where you measure the seriousness of the offense. You look at the environmental injury that's caused by the offense. You look at the need for deterrence. You look at the lack of diligence. These are the gravity factors, and that's the other component of the penalty. So what Mr. Stisons was doing is he was mixing up these different components. The economic benefit is simply to ascertain and to establish a level playing field so that if this person operated more efficiently, more economically with the noncompliant system, they shouldn't benefit from that. Thank you. Thank you. I'm sure you need the sheet. Your honors. May it please the court, I am Christopher Turner, the Illinois Assistant Attorney General, here on behalf of the respondents of the Pollution Control Board of the people of the state of Illinois. The court should affirm the board's decision imposing the $716,440 penalty on toil, violating Section 9 of the Illinois EPA by operating its facility for eight years in violation of the board's BOM, that's the Volatile Organic Materials Emissions Regulation. And the issue raised in this direct appeal is whether the board's decision imposing that penalty was clearly arbitrary, capricious, or unreasonable. And making this presentation, I will first give a little background, but then I will address toil's arguments really into two sections. One is the arguments that Section 33C of the Act precluded any penalty here. And the second one is toil's arguments that Section 42H of the Act requires this court to reduce the penalty that was imposed. Now, this is important because this was, the counsel, toil has conflated the two different sections. Section 33C does provide five factors that the board is supposed to consider, the record, in light of these five factors before issuing really any order, including imposing a penalty, a monetary penalty. This is an initial decision about whether or not a monetary penalty, in this case, would be appropriate. Although, of course, you could also apply the same factors for other types of orders that the board would issue, whether it has to do with violations or anything having to do with pollution or emissions. 42H, which was added later in 1990, is a section which broadly authorizes the board, within its discretion, to consider all the facts in the record. And in light of, well, any facts at all circumstances in determining the appropriate penalty, that is, the amount of the monetary penalty. And then it includes the seven factors. Now, in this case, the board actually explicitly went through all seven factors. And after going exhaustively through the entire, all the evidence in the case, then addressed each of those factors in light of, in light of the record. However, there's no particular, there's no equation, there's no certain amount that has, you know, if it's five to two factors, that's what's necessary to get a penalty here. This is a, this is a penalty decision which, for the administrative agencies, is particularly within their discretion, their discretion and their expertise. Now, Section 33C, as I said, requires the board to consider five factors. And here they expressed, the board expressly considered all five factors and concluded that two of the factors in particular, that is, the character and degree of the injury to the public health and welfare, and the technical practicality and reasonableness of reducing the emissions consistent with the regulation, warranted the imposition of a penalty. It was well within the board's discretion to reach these two conclusions. By operating for eight years in violation of these, the VOM standard, toil emitted excess VOM into the ambient air in Chicago, which is undisputed as a severe ozone non-attainment area during this entire time, thereby harming the public health and welfare, and further, under interfering with the state's ability to comply with the federal mandate under the Clean Air Act, that it needs to improve the quality by enforcing such regulations providing control standards for all the major source emitters. Now, it's also undisputed here that toil's manufacturing facility was and still is a major source of VOM emissions under the Act. That means that it was already decided as a matter of federal law at this point that they were a major contributor to the VOM emissions in the ambient air. This is not a case just like your classic plume case. We have a significant concentration of chemicals in an immediately adjacent concentrated area around the polluter, and you have a cluster of a cancer or some other sort of effect. This is a broad plume in a sense, the entire Chicago area, which is suffering from adverse ozone pollution, which affects the public health of all the millions of residents there. Therefore, under the Clean Air Act, the U.S. Congress had mandated both that the state and through the state the board would implement enforceable regulations, enforce those regulations, and create control standards. They actually had to apply for the 81 percent control standard, which they had issued in February of 1994 and went effective in March of 1995. Here we have the record. Not only has toil repeatedly admitted that they were operating this entire time in violation of the Act and that various parts of their process were emitting VOM above the standard, but the record shows that in 1999 they had over 36 tons of VOM emissions and in 2000 over 47 tons. So this is all that was required for the board of its discretion to say, yes, an imposition of a monetary penalty is warranted. It was also within its discretion to determine that the technical practicality and the economic reasonableness of complying also warranted a penalty here. Contrary to toil's characterization, the board didn't simply refuse to consider this factor. It did consider this factor explicitly. It didn't say just simply because toil had not sought a variance or other regulatory relief that this factor is automatically found. It reviewed the evidence in the opinion and says the board found the technology that it ultimately did use to comply in April of 2003 was neither novel nor unavailable nor unreasonable. The RCO unit that it used, recuperative oxidizer, sorry. Catalytic. Thank you, catalytic oxidizer. That was the same. It was available in the 1990s. It was the same one they had initially bought. The other technology which they then used to fit that to its plant to comply was all available in the 1990s. Toil argued that they had a difficult time and they had to custom fit it. However, the board considered this evidence and decided no, that does not equate to a whole new technology. The mere fact that it took you five years to do it doesn't mean that it wasn't available or that you couldn't have done it sooner. Now, they did also find that they never sought a variance. They never sought regulatory relief. And that is relevant here actually because, first of all, unlike the Modine case, which Toil cites too, here in 1994 when they promulgated this regulation, the board had made a finding. After holding public hearings, after considering factors, when it came up with its 81% control standard, it made actually a factual finding that this standard was technically feasible for industry and it was economically reasonable. Therefore, the fact that they didn't turn around as they were having any difficulties and consistent with not only the opportunity but their obligations under the Act, if they wanted relief, they were supposed to go and seek a variance, which doesn't mean the regulation goes away. Assuming even they're successful, that just means perhaps they would get more time or perhaps in some ways the requirements would be changed for them or their industry in particular. Toil, now I'd like to move on to Section 42H, which actually, though that is another consideration, just when the Modine case was decided in 1990, it was using the 1987 statute, which preceded even the existence of 42H when it was added to the Act. When 42H set out its factors to consider and considering what kind of penalty to impose, in its pattern for due diligence, whether or not you diligently attempted to comply with the regulation, to consider that, it also actually explicitly says, or it authorizes the Board to consider whether you diligently attempted to seek regulatory relief. Once the Board had determined that a penalty was appropriate, it then looked at the seven identified factors in the record, and the Board found that four factors in particular warranted a substantial penalty here. The duration and gravity of Toil's violations, its lack of diligence in attempting to comply, the need to deter Toil and other companies from engaging in similar delays in compliance in the future, and then the economic benefits that accrue to Toil from its violations. As with its challenge to the penalty under Section 33, Toil's arguments trivialized the gravity of its violations here. For the Clean Air Act, the regulations in the Clean Air Act were part of a broad-based nationwide effort to clean up and to reduce the ozone pollution, and Chicago is particularly identified as a place suffering from severe ozone pollution. Therefore, we have here in the record significant VOM emissions, emissions which were, in order simply to be a major source of such emissions,  but their actual VOM emissions were beyond that. Now, the key thing here is, yes, you could still perhaps comply with the regulations and have such VOM emission levels, but the fact that the United States Congress decided the way to control this was not to create some bright line, 25 tons, that's it, or 20 tons, or some other number, but instead say, once you're a major emitter, once you're a major source of this form of pollution, since it's pollution which is coming collectively from everyone, your obligation there is then to reduce it, to use a technology to reduce your emissions by a certain percent, and that's how we're going to clean it up. They didn't comply with that. They, therefore, were emitting excess VOM and undermining that effort to clean up the air. When they did this for eight years on and continuing to operate, that resulted in a grave and a serious violation of the act and a violation of environmental policy. The board also properly exercised its discretion in terming that Toil's lack of diligence in attempting to timely comply warranted a substantial penalty. Here, the board was not ignoring Toil's efforts to comply or the fact that it was trying to integrate it with other business operations, but the point is here that the fact that the EPA was cooperating with Toil, was trying to help Toil comply as it's supposed to, does not somehow forgive or alleviate Toil's obligations to comply. They were the ones, after they self-disclosed, yes, in 1996, as they were required to with their permit, that they were not meeting it, that they then gave a compliance plan. They said, look, here's our plan, we're going to comply. But then they didn't meet the plan. And, actually, in early 1998, you'll see in the record, that's when they first said, we're going to have to inform the EPA, we're going to have to change our test dates to comply. That's when they're, for the first time, trying to get approval to get the RCO unit. Then, at that point, the EPA gives them the notice of violation. It's not that they already knew, both Toil and the EPA knew that they were in violation, but this is a formal event, the notice of violation in July of 1998, which under that, actually, I think it's Section 31, various procedures and hoops that the EPA has to go through in order to just initiate the whole enforcement process. If they're going to try to refer this case to the Attorney General for enforcement action later, they've got to first provide a notice at a certain point, then engage in certain meetings and efforts, and then refer it over. So, in 1998, when they saw at this point that Toil was not meeting its own compliance plan, then they provide the notice to get this process started. Now, they don't walk away, they continue to meet with Toil, but what we see here is, for the next eight years, a series of missed dates, canceled dates, requests for extension. This goes on and on. Not only does it go on for years, but it goes on after the Attorney General finally files his enforcement action against him. It goes on for a whole other three years after that. Now, the Board's determination that the Toil's economic benefits from its eight years of violations warranted a $316,000 component of this penalty was neither arbitrary nor capricious. Now, just to break down the penalty for you, the way that the Board came up with the penalty when it did was it said, well, we're going to impose $316,000 approximately for the economic benefits that accrue to Toil, and then another $400,000 in light of the other aggravating factors. That basically roughly was $50,000 per year of violation. Now, the statute requires it, mandates this. This is actually the one part of Section 42H which clearly does not provide discretion to the Board. It says the Board must ensure that the penalty is at least as large as the economic benefits that accrue to Toil. How did they determine $50,000 a year? $50,000, it was asked by the State, it was requested, and that was a number that they came up with based on essentially looking at the gravity of the violation, looking at the lack of diligence. That certainly was a substantial penalty. Given the eight years, it was not particularly substantial. And it had to be greater than $316,440. The total penalty had to be greater than that. They didn't have to do another, just because they found aggravating factors doesn't mean necessarily they would have to double it, for instance, double the $316,000. No. It had to be greater than that. But they came up with the $50,000, which is just a year, which is a tiny percentage of it. If you look at Toil's Exhibit No. 2, which is in the record, it's after tax profits were owed. They also did not assess attorney's fees. No, they did not assess attorney's fees. Both sides, when they argued over the economic benefits, agreed essentially that they had spent about $1,250,000 in compliance efforts, yet this penalty was only a small fraction of that. So, for instance, if they had found some sort of a serious bad faith or other kinds of deceptive acts or other things, then, yes, it would have been much higher. The needs for deterrence and the seriousness of the violation would have called for something more. But here, that's not required. Section 42H doesn't require that kind of bad faith. Actually, it explicitly just requires what is their diligence in attempting to comply. That's the factor that you look at, and that's what they did. And they found that they did not diligently devote their resources and their investments while they engaged in a $5-$6 million business expansion during this time, and they could have complied earlier. On the economic benefits, the main dispute then ended up being just whether or not to add the lost savings that Toil claims it would have reaped if it complied. The Board decided to note that that was not a proper measure of economic benefits. It's not a methodology. It was a discretionary decision of the Board looking at what are these kinds of – do we offset the economic benefits that accrue? The statute explicitly provides it. It says nothing about lost savings or foregone benefits. It says – it authorizes the Board, broadly, to consider such – any economic benefits that accrue as a result of the delay in compliance, and then requires it, at the very least, to impose a penalty at least that large. And that's exactly what the Board did in this case. Thank you, Mr. Chairman. For the reasons in our brief and set forth here, we request that you affirm the decision of the Board. Thank you, Counselor. Counselor. Thank you. I want to address the point that he says that the Board made the determination that the technology was reasonably available to control, capture, and control 81 percent of the BOM emissions at Toil's plant. That's actually not a finding at all that was made. There was no reference in the order of the Board to Toil's plant. There's no reference to the type of equipment that Toil used at his plant or the type of operation it had at his plant. And, in fact, there is no evidence in the record of any technology that could have been used by Toil to obtain more time to compliance than what Toil obtained. In fact, there was no witness from the agency that actually testified in this case. And even in my opponent's argument, he doesn't point to any evidence in the record to show any lack of good faith or any lack of diligence. All of the testimony in the record in this case is about these efforts that Toil was making and the challenges that they had here. The idea of putting a permanent total enclosure around equipment had to have a negative pressure to create the vacuum but couldn't have too great a pressure or else you get too much of the equipment, which itself had operated under pressure, which you couldn't affect the pressure on. These were technical challenges that had no precedent in terms of how they should be solved. And there's no evidence in the record that there was technology available that could have been used by Toil. So the emphasis that we place on the fact that the Board's orders have to be based on the evidence of record in the case, and there isn't that evidence in this record. And that's why the findings of technical practicability, which is referred to another order of the Board, which doesn't even reference this type of equipment, doesn't establish that which the Board relied on. In addition to the solvent, Toil invested $1.1 million in a vacuum skid condenser piece of equipment, and that equipment turned out not to be necessary to control the emissions because actually what they did is they were able, with the Toil permanent enclosures, to reduce the flow off of the equipment. So there wasn't so much flow, so they didn't need this piece of equipment. But under the EPA manual and how you calculate economic benefit, they provide for incorporating the calculation of the cost made in good faith, even if it was not used, of a pollution control equipment. Mr. Stisons refused to consider that, not that he disagreed that that was expended by Toil in good faith for purpose of pollution control, but he refused to consider it because it wouldn't be consistent with his determined approach. And again, my opponent says that the Board simply chose not to consider the solvent recovery in the economic benefit, but they adopted and supported Mr. Stison's testimony that he didn't look to see whether those costs were well documented. He, in fact, intimated in his testimony that they were documented, and he saw that. Are you talking about the chiller? Well, the chiller is the $1.1 million vacuum skid chiller. And then there's another factor. So you're not talking about the chiller then? Because the Board specifically said there was a discovery difficulty. Yes. And the chiller would not be considered because of that difficulty. Well, the Board actually, the evidence was that Mr. McClure amended his report, which had a negative, he showed that because of the solvent recovery, that there's no dispute is in evidence. The solvent recovery resulted in negative economic benefit. But then he amended that report before hearing because he included the $1.1 million of the vacuum skid chiller, which further reduced the negative economic benefit by another $100,000. I'm referring to the fact that Mr. Stison's economic benefit, and he was cross-examined on the fact that he didn't include the chiller. And that was in the record, that he didn't include the chiller. And his refusal to include the chiller is based on his adoption of a deterrent approach. Counsel, you have one minute. The Board clearly says the Board previously determined it would not consider the evidence on which that theory is based. So are you asking us to review that decision? Well, that's clearly incorrect in terms of what the hearing officer ruled and what the motion to state was, was to exclude the supplemental opinion of Mr. McClure. The Board overstated in its order that it refused to consider. So it refused to consider matters of evidence that were admitted without objection. And I'm referring to the cross-examination of Mr. Stison's, which was admitted into evidence without objection when the Board says we won't consider it. That's an error on the Board's part. And yes, that's what I'm saying. And just for purposes of the record, I'm referring to something in the appendix at page 16. Thank you. For these reasons, we would ask that the Court reverse the penalty, $716,440 penalty, as well as the cease and desist order, and enter an order that provides that for the violations admitted and shown of record, there should be no penalties warranted. Thank you, Your Honor. Thank you, Counsel. The Court will take this case under advisement.